IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.                                                    No.  4:15-CR-038-O

DANTANA TANKSLEY            (01)

## RESPONSE TO SUPPRESSION MOTION

Respectfully submitted,

JOHN R. PARKER
ACTING UNITED STATES ATTORNEY


/s/ Frank L. Gatto
FRANK L. GATTO
Assistant United States Attorney
Texas Bar No. 24062396
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone: 817.252.5213
Facsimile: 817.252.5514
E-mail: Frank.Gatto@usdoj.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................ii

RESPONSE TO SUPPRESSION MOTION..................................................... 1

    I.     ISSUE PRESENTED ................................................................ 1

    II.    FACTUAL BACKGROUND ..................................................... 1

    III.   LEGAL STANDARD ................................................................ 5

    IV.   ANALYSIS ................................................................................ 9

        A.    The officers had reasonable suspicion to detain Tanklsey to investigate whether he was the shooter, and they had probable cause to arrest Tanksley for evading detention with a vehicle .......... 9

        B.    The officers' warrantless search of the car Tanksley was driving was reasonable under the Fourth Amendment because it was supported by probable cause and exigent circumstances................. 13

CONCLUSION ........................................................................................... 15

CERTIFICATE OF SERVICE....................................................................... 16

i

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                              **Page(s)**

*Arizona v. Gant*, 129 S. Ct. 1710 (2009) ............................................................. 6

*Cady v. Dombrowski*, 413 U.S. 433 (1973) ........................................................ 8

*California v. Carney*, 471 U.S. 386 (1985) .................................................... 7, 14

*Illinois v. Lidster*, 540 U.S. 419 (2004) ......................................................... 5, 11

*Michigan v. Long*, 463 U.S. 1032 (1983) ............................................................ 6

*Terry v. Ohio*, 392 U.S. 1 (1968) ............................................................... 5, 8, 9

*United States v. Abdo*, 733 F.3d 562 (5th Cir. 2013) ........................................... 5

*United States v. Arvizu*, 534 U.S. 266 (2002) ................................................. 5, 8

*United States v. Banuelos-Romero*, 597 F.3d 763 (5th Cir. 2010) ..................... 7

*United States v. Bolden*, 508 F.3d 204 (5th Cir. 2007) ......................... 9, 10, 11

*United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) ................................... 8

*United States v. Castelo*, 415 F.3d 407 (5th Cir. 2005) ........................ 7, 13, 14

*United States v. Estrada*, 459 F.3d 627 (5th Cir. 2006) .................................... 6

*United States v. Fields*, 456 F.3d 519 (5th Cir. 2006) ................................. 7, 14

*United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005) ............................. 5, 6, 9

*United States v. Ned*, 637 F.3d 562 (5th Cir. 2011) ......................................... 6

*United States v. Sanders*, 994 F.2d 200 (5th Cir. 1993) ................................. 12

*United States v. Sharpe*, 470 U.S. 675 (1985) ................................................. 8

*United States v. Sinisterra*, 77 F.3d 101 (5th Cir. 1996) ............................ 7, 14

**Federal Cases (continued…)** **Page(s)**

*United States v. Sokolow*, 490 U.S. 1 (1989) ...................................................... 6

*United States v. Spencer*, 575 F. App'x 274 (5th Cir. 2014) ...................................... 9, 10

*Whren v. United States*, 517 U.S. 806 (1996) ................................................... 8

**State Cases**

*State v. Rodriguez*, 339 S.W.3d 680 (Tex. Crim. App. 2011) .......................................... 14

**State Statutes**

Tex. Penal Code § 38.04 ........................................................................ 12, 13

Tex. Penal Code § 38.04(b) ..................................................................... 12

Tex. Penal Code § 42.12 ........................................................................ 13

## RESPONSE TO SUPPRESSION MOTION

The government opposes Dantana Tanksley's ("Tanksley") motion to suppress all evidence, including the alleged firearm and any statements he made that are the fruit of Tanksley's detention and the search of the car he was driving on August 24, 2014.  The officers' actions were reasonable under the Fourth Amendment because the peculiar circumstances of this case show the officers were acting in a swiftly developing situation requiring them to take swift actions predicated on their on-the-spot observations in investigating a very dangerous and volatile situation.

## I.     ISSUE PRESENTED

Tanksley argues "the officers had no basis to order [him] to stop his vehicle when he turned into [a] parking lot rather than sit in [a] line of cars that were stopped by officers."  (Def.'s Mot. at 4.)  Tanksley also contends that after pulling his vehicle into the parking lot and stopping, the officers had neither "articulable facts" nor "reasonable suspicion" to justify them drawing their guns and detaining him.  (*Id.*)  And Tanksley maintains the officers lacked any probable cause or any other legal justification to search and seize the car he was driving without a warrant.  (*Id.*)

## II.    FACTUAL BACKGROUND[1]

Around 3:48 a.m. on August 24, 2014, Fort Worth police officers Rutledge, Vistine, Lott, and Snodderly were standing at the west-end egress and ingress of Southway Circle, which is on the corner of Southway Circle and South Freeway, when

---

[1]  The following are facts the government believes it could prove at any hearing on this motion.  They are also supported by the attached police reports, which Tanksley quotes in his motion.

**Response to Suppression Motion - 1**

they heard several gunshots coming from the east end of Southway Circle.  The officers

knew Southway Circle dead-ended into a *cul-de-sac* on the east side, and due to the

number of shots fired and the sound of the shots, they believed the shots came from a

semi-automatic rifle containing a high-capacity magazine rather than a handgun.

Officers Rutledge, Vistine, Lott, and Snodderly immediately responded and saw

many people fleeing on foot and in cars, heading west bound on Southway Circle toward

South Freeway.  Due to their experience patrolling this area, the officers were aware that

mid-way down Southway Circle was a business that operated as an after-hours

establishment.  Many people frequent the after-hours establishment, and the officers had

responded to numerous calls in the past regarding fights and other violent activity

occurring at the after-hours establishment.

That night, the north and south sides of Southway Circle were completely filled

with parked cars, as hundreds of patrons were at the after-hours club.  As the four officers

made their way east on Southway Circle on foot, they saw a number of cars in line and

backed-up, moving very slowly in a traffic jam of other cars and pedestrians, all trying to

leave the scene.  While they made their way east, the officers spread out and very briefly

stopped numerous people on foot and in their cars to ascertain any witnesses, if anyone

had been shot or injured, if there was a continuing threat, where the shots occurred, and

who the shooter may be.  At this point, the officers were unaware if anyone had been shot

and needed life-saving treatment; who, if anyone, was the target of the shots; who the

shooter was and where the shooter was located; and whether there was a continued threat

**Response to Suppression Motion - 2**

or active-shooter situation.  Thus, the officers moved very quickly because not only were they uncertain as to whether there was a continuing threat and whether anyone needed immediate life-saving treatment, they were also fairly certain the shooter had not escaped the scene.

Each stop of a person, whether on foot or in their cars, was very brief as the officers did not waste time if they could immediately determine the person was not injured, a witness, or the shooter.  Some of the people they stopped either pointed or nodded their head west, indicating the shots came from or the shooter was further west down the street.

In the line of cars trying to flee was Tanksley, the driver and sole occupant of a silver, two-door convertible with the top down.  Tanksley made eye contact with Officer Snodderly and immediately turned out of the line of cars and into a parking lot at a high rate of speed.  Officer Snodderly, in uniform, loudly commanded Tanksley to stop the car.  Tanksley looked at Officer Snodderly, appearing to have heard the command to stop, but disregarded it.  He continued to drive north in the parking lot, stopping only when he came upon a dead end about 200 feet later.

Officers Snodderly and Lott pursued on foot to where Tanksley had stopped at the dead end.  Suspecting Tanksley could be the shooter and concerned with his erratic behavior, the officers drew their guns and ordered Tanksley to show his hands.  After repeated commands to show his hands, Tanksley flung open the driver's side door but still refused to show his hands or get out of the car.  As the officers approached Tanksley

**Response to Suppression Motion - 3**

in the car, Tanksley got out and began walking toward the front of the car, still disregarding the officers' commands.  The officers apprehended Tanksley and placed him into handcuffs for their safety as they continued to investigate the shots fired.

Officer Lott walked around to the passenger side of the convertible and, in plain view on the passenger-side front seat, he saw a discharged 7.62x39mm casing.  When asked, Tanksley denied having any weapons in the car.  But due to the circumstances and after seeing the discharged shell casing in plain view on the passenger seat, the officers believed they had probable cause and exigent circumstances to search the car.  Inside the trunk, the officers found a stolen Izhmash (SAIGA), Model IZ132, 7.62x39mm caliber semi-automatic rifle in the trunk.

Other assisting officers searched the area and found about 17 discharged 7.62x39mm casings on a driveway near the after-hours establishment.  Many of them appeared to match the discharged casing found in plain view on the passenger seat of the convertible and the remaining 7.62x39mm ammunition in the rifle.  A witness also spoke to officers and provided a written statement.  The witness informed officers the incident occurred where the discharged casings had been found.  The witness explained that a burgundy Chevrolet Blazer had blocked the silver convertible in its parking spot.  The witness said the driver of the silver convertible began shooting a gun in the air, and the Blazer drove off and several people began to run.

After learning the rifle was stolen and that Tanksley had several prior felony convictions, the officers arrested Tanksley for unlawful firearm possession, evading

**Response to Suppression Motion - 4**

arrest and detention with a vehicle, firearm theft, and discharging a firearm in certain

municipalities.

## III.   LEGAL STANDARD

There is "no question" that stopping a car and detaining the occupant "is a seizure

within the meaning of the Fourth Amendment."  *United States v. Jaquez*, 421 F.3d 338,

341 (5th Cir. 2005).  But the law also

> permits police to seek the voluntary cooperation of members of the public
> in the investigation of a crime.  Law enforcement officers do not violate the
> Fourth Amendment by merely approaching an individual on the street or in
> another public place, by asking him if he is willing to answer some
> questions, or by putting questions to him if the person is willing to listen.

*Illinois v. Lidster*, 540 U.S. 419, 425 (2004) (internal marks omitted).

It is also well settled that police "may detain a suspect and briefly investigate

when they have reasonable suspicion" that criminal activity may be afoot.  *United States

v. Abdo*, 733 F.3d 562, 565 (5th Cir. 2013) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

Thus, an investigative stop of a car suspected of criminal activity is analyzed under the

*Terry* framework.  *Jaquez*, 421 F.3d at 340.

An officer may stop a car and detain its occupant if the officer has reasonable

suspicion of criminal activity.  *Id.*  Reasonable suspicion exists when the peculiar

circumstances of a case reveal an "objective basis for suspecting legal wrongdoing."

*United States v. Arvizu*, 534 U.S. 266, 273 (2002).  The detaining officer "must be able to

point to specific and articulable facts which, taken together with rational inferences from

those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21-22; *United States v.*

**Response to Suppression Motion - 5**

*Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).  While the reasonable-suspicion standard requires more than a "mere hunch" or an "unparticularized suspicion," it "is less stringent" than the probable-cause standard required for a full arrest.  *Jaquez*, 421 F.3d at 341.  Thus, reasonable suspicion requires only "a minimal level of objective justification for the stop . . . be present."  *Id.*; *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The Supreme Court has also recognized that vehicle stops "are especially fraught with danger to police officers."  *Michigan v. Long*, 463 U.S. 1032, 1047 (1983); *see also Arizona v. Gant*, 129 S. Ct. 1710 (2009) (Scalia, J., concurring) ("Law enforcement officers face a risk of being shot whenever they pull a car over.").  Because these "roadside encounters between" the police and suspects "are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect," the police may conduct "protective searches" if there is "a reasonable belief based on specific and articulable facts . . . taken together with the rational inferences from those facts" that "the suspect is dangerous" and could have access to weapons.  *Long*, 463 U.S. at 1049.

Finally, it is well established that "warrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause."  *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011).  Under this "automobile exception" to the Fourth Amendment's warrant requirement, police may search a car "if they have probable cause to believe that the [car] contains . . . evidence of a crime."  *Id.*  As the Supreme Court explained:

**Response to Suppression Motion - 6**

> When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play. First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling. . . . Our application of the vehicle exception has never turned on the other uses to which a vehicle might be put. The exception has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation.

*California v. Carney*, 471 U.S. 386, 392-93 (1985); *see also United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir. 1996) (exigent circumstances are supplied by "the fact of the automobile's mobility").

"Probable cause to search an automobile exists where trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains" evidence of a crime. *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005). "Probable cause is determined by examining the totality of the circumstances." *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006). And a "police officer may draw inferences based on his own experience in deciding whether probable cause exists, including inferences that might well elude an untrained person." *United States v. Banuelos-Romero*, 597 F.3d 763, 768 (5th Cir. 2010) (citation omitted).

But regardless of whether the Court's inquiry involves evaluating the officers' conduct under a reasonable-suspicion standard or a probable-cause standard or a

**Response to Suppression Motion - 7**

combination of both, the "ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski*, 413 U.S. 433, 440 (1973). Reasonableness requires balancing the public interest against a person's right to be free from arbitrary intrusions by law enforcement, and it is measured objectively by examining the totality of the circumstances peculiar to the case. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). "The correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers . . . were reasonable under the circumstances." *Brigham*, 382 F.3d at 507. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotations and citations omitted).

In that regard, the reasonableness inquiry recognizes that the police conduct at issue here involves the "necessary swift action predicated upon the on-the-spot observations of the officer[s] on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry*, 392 U.S. at 20. It acknowledges that a court making the inquiry "should take care to consider whether the police are acting in a swiftly developing situation . . . ." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). And it observes that the

> scheme of the Fourth Amendment becomes meaningful only when it is
> assured that at some point the conduct of those charged with enforcing the

**Response to Suppression Motion - 8**

laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?

*Terry*, 392 U.S. at 21-22. The answer here is yes.

"The government bears the burden of showing the reasonableness of a warrantless search or seizure." *Jaquez*, 421 F.3d at 341.

## IV.   ANALYSIS

Based on the peculiar facts and circumstances of this case, the officers' actions were completely reasonable under the Fourth Amendment. And in that regard, the Court need look no further than the Fifth Circuit's decisions in *United States v. Bolden*, 508 F.3d 204, 205 (5th Cir. 2007) and *United States v. Spencer*, 575 F. App'x 274, 276 (5th Cir. 2014).

### A.   The officers had reasonable suspicion to detain Tanksley to investigate whether he was the shooter, and they had probable cause to arrest Tanksley for evading detention with a vehicle.

In *Bolden*, the appellate court held that an objectively reasonable suspicion sufficient to justify stopping several individuals existed when the individuals were traveling in a vehicle approaching an officer from the general direction where the officer had heard gunshots fired less than a minute earlier. *Id.* at 205. Although the officer justified his stopping the vehicle, in part, as an attempt to identify witnesses to or victims

of the shooting, the Fifth Circuit reasoned that did not "negate the very real possibility that the lawbreakers were in the vehicle"—especially given the timing, the vehicle's location to the shooting, the vehicle's "relatively fast pace," and the officer's nearly contemporaneous warning that the shooters were around the corner.  *Id.* at 206–07.  And the Fifth Circuit held the officer's actions reasonable even though the officer "did not even know that a vehicle, [much less the type of vehicle], was involved in the shooting. *Id.*

In *Spencer*, the appellate court found objectively reasonable suspicion sufficient to justify Spencer's detention when a Dallas police officer, working off-duty at a mall, heard gunshots and immediately thereafter saw Spencer, carrying a silver object, running in his direction and away from where the officer heard the gunshots.  575 F. App'x at 275.  The Fifth Circuit found it reasonable for the officer to surmise that "Spencer may have fired the gunshots" and it blessed the officer's decision to draw his weapon, order Spencer to lie on the ground, and perform a patdown search that uncovered the firearm in Spencer's jacket pocket.  *Id.*

The critical key in the *Bolden*, *Spencer*, and similarly present in this case "is the amount of time between learning of the shootings and responding, coupled with the proximity between the stop and where the shootings occurred."  *Bolden*, 508 F.3d at 206.  Here, the officers were already on Southway Circle when they heard several gunshots coming from the east end of the street, making their response immediate.  The officers were familiar with the street, knowing it ended in a *cul de sac* and the only way to leave

the scene was west, toward them.  Thus, they were reasonable in believing the shooter was still on the street and that the shooter would have to go west toward them to leave the scene.  *Cf. Bolden*, 508 F.3d at 207 ("The situation is different where the amount of time is less than a minute.  Then, it is reasonable to believe that the shooters are close, maybe very close.").

The officers could tell from the amount of shots, their rapidity, and its sound that they came from a semi-automatic rifle containing a high-capacity magazine and not a handgun.  Being immediately on the scene, the officers charged with investigating this very dangerous and volatile situation did not know at the time whether there was any continued threat: Was this was an active-shooter situation?  Was the shooter severely intoxicated?  Is this gang violence?  Are the officers themselves targets?

Further, the officers did not know who may have witnessed the shooting and they did not know whether anyone was injured or required life-saving treatment.  What the officers could reasonably surmise is that the shooter, a witness, or a victim was probably still present at the scene and may be in any of the cars or be any one of the pedestrians trying to leave the scene.  Thus, their brief detentions to ascertain more information are completely reasonable under the Fourth Amendment.  *See, e.g.*, *Lidster*, 540 U.S. at 426 (upholding suspicionless stop of an automobile to look for witnesses to a crime because the stop advanced investigating a crime of grave public concern).

From those brief detentions, the officers learned that the shooter was further east down the street.  As they continued to make their way down the street, they encountered

Tanksley driving a convertible with the top down in the line of cars slowly trying to leave the scene. Tanksley's car was the only one that left the line of cars when he saw the officers. And Tanksley's car was the only car that tried to evade the officers. Although the officers already possessed reasonable articulable suspicion to briefly detain Tanksley while he was in the line of cars, either as the potential shooter or a witness, his additional conduct of trying to evade the officers further enhanced their reasonable suspicion that he may be the shooter. And given the dangerous and volatile situation, the officers were justified in drawing their weapons in their attempt to detain Tanksley to further investigate whether he was the shooter. *See United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993) (pointing weapon at suspect, ordering suspect to lie on ground, and handcuffing suspect does not "automatically convert an investigatory detention into an arrest requiring probable cause").

Nevertheless, even if the officers somehow converted Tanksley's detention into an arrest because they drew their weapons, ordered him to the ground, and handcuffed him, at the time they did so the officers also had probable cause to arrest him for evading in a vehicle. Under Texas Penal Code § 38.04, it is an offense for an individual to intentionally flee from a person the individual knows is a peace officer attempting lawfully to arrest or detain the individual. The evading offense is considered a state jail felony if the individual uses a vehicle to evade. Tex. Pen. Code § 38.04(b). When Tanksley left the line of cars and disregarded the officers' command to stop, requiring the officers to pursue him, he committed the evading offense. *Id.* The Texas statute does not

**Response to Suppression Motion - 12**

require the flight be of a certain length or duration to constitute the offense. *See* Tex. Pen. Code § 38.04. The officers were in full uniform, they loudly commanded Tanksley to stop, and Tanksley responded as if he heard the officers but he disregarded their commands. And since the officers could lawfully detain Tanksley, his decision to evade the officers violated section 38.04. Thus, Tanksley's armed apprehension was also justified under the probable-cause standard.

> ### B. The officers' warrantless search of the car Tanksley was driving was reasonable under the Fourth Amendment because it was supported by probable cause and exigent circumstances.

Likewise, the officers' warrantless search of the car Tanksley was driving was also reasonable because there was probable cause to believe that Tanksley was the shooter and evidence of his offense would be in the car, and it was supported by exigent circumstances. *Castelo*, 415 F.3d at 412.

Texas Penal Code § 42.12 makes it an offense to reckless discharge a firearm inside the corporate limits of a municipality having a population of 100,000 or more. The officers heard several shots fired from what they determined based on their training and experience to be a semi-automatic rifle having a high-capacity magazine. The shots occurred in the Fort Worth municipality, which according to the U.S. Census Bureau has a population greater than 100,000.[2] And the shots occurred in a crowd of people, which recklessly placed them in danger of serious harm. *See State v. Rodriguez*, 339 S.W.3d 680, 683 (Tex. Crim. App. 2011) (listing "shooting into the ground in a crowd of people"

---

[2] http://quickfacts.census.gov/qfd/states/48/4827000.html.

**Response to Suppression Motion - 13**

and "shooting a gun in the air in a residential district" as the sort of "actions that might entail a known and unjustifiable risk of harm or injury to others, risks that the ordinary person in the defendant's shoes probably would not take"). Thus, at the time the officers detained Tanksley, they also had probable cause to believe he violated section 42.12 and that evidence of that crime may be in the car he was driving.

After apprehending or detaining Tanksley, Officer Lott walked around the passenger side of the car Tanksley was driving and saw in plain view a discharged 7.62x39mm bullet casing. That observation added to the totality of the circumstances—the officers being immediately on the scene when they heard several gunshots come from what they believed was a semi-automatic rifle having a high-capacity magazine and Tanksley's evasive behavior—and provided sufficient trustworthy facts that "would cause a reasonably prudent [officer] to believe" that Tanksley's car would contain the rifle. *Castelo*, 415 F.3d at 412. And since Tanksley was already using his car in an attempt to flee the scene and evade the officers, exigent circumstances existed justifying the warrantless search. *See Carney*, 471 U.S. at 393 ("The [automobile] exception has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation."); *Sinisterra*, 77 F.3d at 104 (exigent circumstances are supplied by "the fact of the automobile's mobility"); *Fields*, 456 F.3d at 524 (acknowledging automobile exception may not apply when car is found parked at a defendant's residence). Thus, the officers' warrantless search of the car was reasonable under the Fourth Amendment.

**Response to Suppression Motion - 14**

Accordingly the government respectfully asks the Court to conclude that Tanksley's warrantless seizure and the warrantless search of the car he was driving was reasonable under the Fourth Amendment.

## **CONCLUSION**

The government respectfully asks that Tanksley's suppression motion be denied.

Respectfully submitted,

JOHN R. PARKER
ACTING UNITED STATES ATTORNEY


/s/ Frank L. Gatto
FRANK L. GATTO
Assistant United States Attorney
Texas Bar No. 24062396
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone: 817.252.5213
Facsimile: 817.252.5514
E-mail: Frank.Gatto@usdoj.gov

**Response to Suppression Motion - 15**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 27, 2015, I electronically filed this response and attachment with the clerk of court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who, presumably, has consented in writing to accepting notice of service by electronic means: Christopher Curtis.

/s/ Frank L. Gatto              

FRANK L. GATTO

Assistant United States Attorney

**Response to Suppression Motion - 16**

# ATTACHMENT